Justice Stevens
delivered the opinion of the Court.
A California statute known as “Assembly Bill 1889” (AB 1889) prohibits several classes of employers that receive state funds from using the funds “to assist, promote, or deter union organizing.” See Cal. Govt. Code Ann. §§ 16645-16649 (West Supp. 2008). The question presented to us is whether two of its provisions—§ 16645.2, applicable to grant recipients, and § 16645.7, applicable to private employers receiving more than $10,000 in program funds in any year— are pre-empted by federal law mandating that certain zones of labor activity be unregulated.
I
As set forth in the preamble, the State of California enacted AB 1889 for the following purpose:
*63 “It is the policy of the state not to interfere with an employee’s choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing. It is the intent of the Legislature in enacting this act to prohibit an employer from using state funds and facilities for the purpose of influencing employees to support or oppose unionization and to prohibit an employer from seeking to influence employees to support or oppose unionization while those employees are performing work on a state contract.” 2000 Cal. Stats, ch. 872, § 1.
AB 1889 prohibits certain employers that receive state funds — whether by reimbursement, grant, contract, use of state property, or pursuant to a state program — from using such funds to “assist, promote, or deter union organizing.” See Cal. Govt. Code Ann. §§ 16645.1 to 16645.7. This prohibition encompasses “any attempt by an employer to influence the decision of its employees” regarding “[w]hether to support or oppose a labor organization” and “[w]hether to become a member of any labor organization.” § 16645(a). The statute specifies that the spending restriction applies to “any expense, including legal and consulting fees and salaries of supervisors and employees, incurred for . . . an activity to assist, promote, or deter union organizing.” § 16646(a).
Despite the neutral statement of policy quoted above, AB 1889 expressly exempts “activities] performed” or “expense[s] incurred” in connection with certain undertakings that promote unionization, including “[a]llowing a labor organization or its representatives access to the employer’s facilities or property,” and “Negotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization.” §§ 16647(b), (d).
To ensure compliance with the grant and program restrictions at issue in this case, AB 1889 establishes a formidable enforcement scheme. Covered employers must certify that no state funds will be used for prohibited expenditures; the *64 employer must also maintain and provide upon request “records sufficient to show that no state funds were used for those expenditures.” §§ 16645.2(c), 16645.7(b)-(c). If an employer commingles state and other funds, the statute presumes that any expenditures to assist, promote, or deter union organizing derive in part from state funds on a pro rata basis. § 16646(b). Violators are liable to the State for the amount of funds used for prohibited purposes plus a civil penalty equal to twice the amount of those funds. §§ 16645.2(d), 16645.7(d). Suspected violators may be sued by the state attorney general or any private taxpayer, and prevailing plaintiffs are “entitled to recover reasonable attorney’s fees and costs.” § 16645.8(d).
II
In April 2002, several organizations whose members do business with the State of California (collectively, Chamber of Commerce) brought this action against the California Department of Health Services and appropriate state officials (collectively, the State) to enjoin enforcement of AB 1889. Two labor unions (collectively, AFL-CIO) intervened to defend the statute’s validity.
The District Court granted partial summary judgment in favor of the Chamber of Commerce,[1] holding that the National Labor Relations Act (NLEA or Wagner Act), 49 Stat. 449, as amended, 29 U. S. C. § 151 et seq., pre-empts Cal. Govt. Code Ann. § 16645.2 (concerning grants) and § 16645.7 (concerning program funds) because those provisions “regulat[e] employer speech about union organizing under specified circumstances, even though Congress intended free debate.” Chamber of Commerce v. Lockyer, 225 F. Supp. 2d 1199, 1205 (CD Cal. 2002). The Court of Appeals for the Ninth Circuit, *65 after twice affirming the District Court’s judgment, granted rehearing en banc and reversed. See Chamber of Commerce v. Lockyer, 463 F. 3d 1076, 1082 (2006). While the en banc majority agreed that California enacted §§ 16645.2 and 16645.7 in its capacity as a regulator, and not as a mere proprietor or market participant, see id., at 1082-1085, it concluded that Congress did not intend to preclude States from imposing such restrictions on the use of their own funds, see id., at 1085-1096. We granted certiorari, 552 U. S. 1035 (2007), and now reverse.
Although the NLRA itself contains no express preemption provision, we have held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy. The first, known as Garmon preemption, see San Diego Building Trades Council v. Garmon, 359 U. S. 236 (1959), “is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the ‘integrated scheme of regulation’ established by the NLRA.” Golden State Transit Corp. v. Los Angeles, 475 U. S. 608, 613 (1986) (Golden State I). To this end, Garmon pre-emption forbids States to “regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.” Wisconsin Dept. of Industry v. Gould Inc., 475 U. S. 282, 286 (1986). The second, known as Machinists pre-emption, forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended “be unregulated because left ‘to be controlled by the free play of economic forces.’ ” Machinists v. Wisconsin Employment Relations Comm’n, 427 U. S. 132, 140 (1976) (quoting NLRB v. Nash-Finch Co., 404 U. S. 138, 144 (1971)). Machinists pre-emption is based on the premise that “ ‘Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.’” 427 U. S., at 140, n. 4 (quoting Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972)).
*66 Today we hold that §§ 16645.2 and 16645.7 are pre-empted under Machinists because they regulate within “a zone protected and reserved for market freedom.” Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc., 507 U. S. 218, 227 (1993) (Boston Harbor). We do not reach the question whether the provisions would also be pre-empted under Garmon.
Ill
As enacted in 1935, the NLRA, which was commonly known as the Wagner Act, did not include any provision that specifically addressed the intersection between employee organizational rights and employer speech rights. See 49 Stat. 449. Rather, it was left to the NLRB, subject to review in federal court, to reconcile these interests in its construction of §§ 7 and 8. Section 7, now codified at 29 U. S. C. § 157, provided that workers have the right to organize, to bargain collectively, and to engage in concerted activity for their mutual aid and protection. Section 8(1), now codified at 29 U. S. C. § 158(a)(1), made it an “unfair labor practice” for employers to “interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.”
Among the frequently litigated issues under the Wagner Act were charges that an employer’s attempts to persuade employees not to join a union — or to join one favored by the employer rather than a rival — amounted to a form of coercion prohibited by § 8. The NLRB took the position that § 8 demanded complete employer neutrality during organizing campaigns, reasoning that any partisan employer speech about unions would interfere with the §7 rights of employees. See 1 J. Higgins, The Developing Labor Law 94 (5th ed. 2006). In 1941, this Court curtailed the NLRB’s aggressive interpretation, clarifying that nothing in the NLRA prohibits an employer “from expressing its view on labor policies or problems” unless the employer’s speech “in connection with other circumstances [amounts] to coercion within *67 the meaning of the Act.” NLRB v. Virginia Elec. & Power Co., 314 U. S. 469, 477. We subsequently characterized Virginia Electric as recognizing the First Amendment right of employers to engage in noncoercive speech about unionization. Thomas v. Collins, 323 U. S. 516, 537-538 (1945). Notwithstanding these decisions, the NLRB continued to regulate employer speech too restrictively in the eyes of Congress.
Concerned that the Wagner Act had pushed the labor relations balance too far in favor of unions, Congress passed the Labor Management Relations Act, 1947 (Taft-Hartley Act). 61 Stat. 136. The Taft-Hartley Act amended §§ 7 and 8 in several key respects. First, it emphasized that employees “have the right to refrain from any or all” § 7 activities. 29 U. S. C. § 157. Second, it added § 8(b), which prohibits unfair labor practices by unions. 29 U. S. C. § 158(b). Third, it added §8(c), which protects speech by both unions and employers from regulation by the NLRB. 29 U. S. C. § 158(c). Specifically, § 8(c) provides:
“The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.”
From one vantage, § 8(c) “merely implements the First Amendment,” NLRB v. Gissel Packing Co., 395 U. S. 575, 617 (1969), in that it responded to particular constitutional rulings of the NLRB. See S. Rep. No. 80-105, pt. 2, pp. 23-24 (1947). But its enactment also manifested a “congressional intent to encourage free debate on issues dividing labor and management.” Linn v. Plant Guard Workers, 383 U. S. 53, 62 (1966). It is indicative of how important Congress deemed such “free debate” that Congress amended the NLRA rather than leaving to the courts the task of correct *68 ing the NLRB’s decisions on a case-by-case basis. We have characterized this policy judgment, which suffuses the NLRA as a whole, as “favoring uninhibited, robust, and wide-open debate in labor disputes,” stressing that “freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB.” Letter Carriers v. Austin, 418 U. S. 264, 272-273 (1974).
Congress’ express protection of free debate forcefully buttresses the pre-emption analysis in this case. Under Machinists, congressional intent to shield a zone of activity from regulation is usually found only “implicit[ly] in the structure of the Act,” Livadas v. Bradshaw, 512 U. S. 107, 117, n. 11 (1994), drawing on the notion that “ ‘[w]hat Congress left unregulated is as important as the regulations that it imposed,’” Golden State Transit Corp. v. Los Angeles, 493 U. S. 103, 110 (1989) (Golden State II) (quoting New York Telephone Co. v. New York State Dept. of Labor, 440 U. S. 519, 552 (1979) (Powell, J., dissenting)). In the case of noncoercive speech, however, the protection is both implicit and explicit. Sections 8(a) and 8(b) demonstrate that when Congress has sought to put limits on advocacy for or against union organization, it has expressly set forth the mechanisms for doing so. Moreover, the amendment to § 7 calls attention to the right of employees to refuse to join unions, which implies an underlying right to receive information opposing unionization. Finally, the addition of § 8(c) expressly precludes regulation of speech about unionization “so long as the communications do not contain a ‘threat of reprisal or force or promise of benefit.’ ” Gissel Packing, 395 U. S., at 618.
The explicit direction from Congress to leave noncoercive speech unregulated makes this case easier, in at least one respect, than previous NLRA cases because it does not require us “to decipher the presumed intent of Congress in the face of that body’s steadfast silence.” Sears, Roebuck & Co. *69 v. Carpenters, 436 U. S. 180, 188, n. 12 (1978). California’s policy judgment that partisan employer speech necessarily “interfere^] with an employee’s choice about whether to join or to be represented by a labor union,” 2000 Cal. Stats, ch. 872, § 1, is the same policy judgment that the NLRB advanced under the Wagner Act, and that Congress renounced in the Taft-Hartley Act. To the extent §§ 16645.2 and 16645.7 actually further the express goal of AB 1889, the provisions are unequivocally pre-empted.
IV
The Court of Appeals concluded that Machinists did not pre-empt §§ 16645.2 and 16645.7 for three reasons: (1) The spending restrictions apply only to the use of state funds, (2) Congress did not leave the zone of activity free from all regulation, and (3) California modeled AB 1889 on federal statutes. We find none of these arguments persuasive.

Use of State Funds

In NLRA pre-emption cases, “ ‘judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.’” Golden State I, 475 U. S., at 614, n. 5 (quoting Garmon, 359 U. S., at 243; brackets omitted); see also Livadas, 512 U. S., at 119 (“Pre-emption analysis . . . turns on the actual content of [the State’s] policy and its real effect on federal rights”). California plainly could not directly regulate noncoercive speech about unionization by means of an express prohibition. It is equally clear that California may not indirectly regulate such conduct by imposing spending restrictions on the use of state funds.
In Gould, we held that Wisconsin’s policy of refusing to purchase goods and services from three-time NLRA violators was pre-empted under Garmon because it imposed a “supplemental sanction” that conflicted with the NLRA’s “‘integrated scheme of regulation.’” 475 U. S., at 288-289. *70 Wisconsin protested that its debarment statute was “an exercise of the State’s spending power rather than its regulatory power,” but we dismissed this as “a distinction without a difference.” Id., at 287. “[T]he point of the statute [was] to deter labor law violations,” and “for all practical purposes” the spending restriction was “tantamount to regulation.” Id., at 287-289. Wisconsin’s choice “to use its spending power rather than its police power d[id] not significantly lessen the inherent potential for conflict” between the state and federal schemes; hence the statute was pre-empted. Id., at 289.
We distinguished Gould in Boston Harbor, holding that the NLRA did not preclude a state agency supervising a construction project from requiring that contractors abide by a labor agreement. We explained that when a State acts as a “market participant with no interest in setting policy,” as opposed to a “regulator,” it does not Offend the preemption principles of the NLRA. 507 U. S., at 229. In finding that the state agency had acted as a market participant, we stressed that the challenged action “was specifically tailored to one particular job,” and aimed “to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.” Id., at 232.
It is beyond dispute that California enacted AB 1889 in its capacity as a regulator rather than a market participant. AB 1889 is neither “specifically tailored to one particular job” nor a “legitimate response to state procurement constraints or to local economic needs.” Gould, 475 U. S., at 291. As the statute’s preamble candidly acknowledges, the legislative purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy. See 2000 Cal. Stats, ch. 872, § 1. Although a State has a legitimate proprietary interest in ensuring that state funds are spent in accordance with the purposes for which they are appropriated, this is not the objective of AB 1889. In contrast to a neutral affirmative requirement that funds be spent solely *71 for the purposes of the relevant grant or program, AB 1889 imposes a targeted negative restriction on employer speech about unionization. Furthermore, the statute does not even apply this constraint uniformly. Instead of forbidding the use of state funds for all employer advocacy regarding unionization, AB 1889 permits use of state funds for select employer advocacy activities that promote unions. Specifically, the statute exempts expenses incurred in connection with, inter alia, giving unions access to the workplace, and voluntarily recognizing unions without a secret ballot election. §§ 16647(b), (d).
The Court of Appeals held that although California did not act as a market participant in enacting AB 1889, the NLRA did not pre-empt the statute. It purported to distinguish Gould on the theory that AB 1889 does not make employer neutrality a condition for receiving funds, but instead restricts only the use of funds. According to the Court of Appeals, this distinction matters because when a State imposes a “use” restriction instead of a “receipt” restriction, “an employer has and retains the freedom to spend its own funds however it wishes.” 463 F. 3d, at 1088.
California’s reliance on a “use” restriction rather than a “receipt” restriction is, at least in this case, no more consequential than Wisconsin’s reliance on its spending power rather than its police power in Gould. As explained below, AB 1889 couples its “use” restriction with compliance costs and litigation risks that are calculated to make union-related advocacy prohibitively expensive for employers that receive state funds. By making it exceedingly difficult for employers to demonstrate that they have not used state funds and by imposing punitive sanctions for noncompliance, AB 1889 effectively reaches beyond “the use of funds over which California maintains a sovereign interest.” Brief for State Respondents 19.
Turning first to the compliance burdens, AB 1889 requires recipients to “maintain records sufficient to show that *72 no state funds were used” for prohibited expenditures, §§ 16645.2(c), 16645.7(c), and conclusively presumes that any expenditure to assist, promote, or deter union organizing made from “commingled” funds constitutes a violation of the statute, § 16646(b). Maintaining “sufficient” records and ensuring segregation of funds is no small feat, given that AB 1889 expansively defines its prohibition to encompass “any expense” incurred in “any attempt” by an employer to “influence the decision of its employees.” §§ 16645(a), 16646(a). Prohibited expenditures include not only discrete expenses such as legal and consulting fees, but also an allocation of overhead, including “salaries of supervisors and employees,” for any time and resources spent on union-related advocacy. See § 16646(a). The statute affords no clearly defined safe harbor, save for expenses incurred in connection with activities that either favor unions or are required by federal or state law. See § 16647.
The statute also imposes deterrent litigation risks. Significantly, AB 1889 authorizes not only the California attorney general but also any private taxpayer — including, of course, a union in a dispute with an employer — to bring a civil action against suspected violators for “injunctive relief, damages, civil penalties, and other appropriate equitable relief.” § 16645.8. Violators are liable to the State for three times the amount of state funds deemed spent on union organizing. §§ 16645.2(d), 16645.7(d), 16645.8(a). Prevailing plaintiffs, and certain prevailing taxpayer intervenors, are entitled to recover attorney’s fees and costs, § 16645.8(d), which may well dwarf the treble damages award. Consequently, a trivial violation of the statute could give rise to substantial liability. Finally, even if an employer were confident that it had satisfied the recordkeeping and segregation requirements, it would still bear the costs of defending itself against unions in court, as well as the risk of a mistaken adverse finding by the factfinder.
*73 In light of these burdens, California’s reliance on a “use” restriction rather than a “receipt” restriction “does not significantly lessen the inherent potential for conflict” between AB 1889 and the NLRA. Gould, 475 U. S., at 289. AB 1889’s enforcement mechanisms put considerable pressure on an employer either to forgo his “free speech right to communicate his views to his employees,” Gissel Packing, 395 U. S., at 617, or else to refuse the receipt of any state funds. In so doing, the statute impermissibly “predicat[es] benefits on refraining from conduct protected by federal labor law,” Liradas, 512 U. S., at 116, and chills one side of “the robust debate which has been protected under the NLRA,” Letter Carriers, 418 U. S., at 275.
Resisting this conclusion, the State and the AFL-CIO contend that AB 1889 imposes less onerous recordkeeping restrictions on governmental subsidies than do federal restrictions that have been found not to violate the First Amendment. See Rust v. Sullivan, 500 U. S. 173 (1991); Regan v. Taxation With Representation of Wash., 461 U. S. 540 (1983). The question, however, is not whether AB 1889 violates the First Amendment, but whether it “'stands as an obstacle to the accomplishment and execution of the full purposes and objectives’ ” of the NLRA. Livadas, 512 U. S., at 120 (quoting Brown v. Hotel Employees, 468 U. S. 491, 501 (1984)). Constitutional standards, while sometimes analogous, are not tailored to address the object of labor preemption analysis: giving effect to Congress’ intent in enacting the Wagner and Taft-Hartley Acts. See Livadas, 512 U. S., at 120 (distinguishing standards applicable to the Equal Protection and Due Process Clauses); Gould, 475 U. S., at 290 (Commerce Clause); Linn, 383 U. S., at 67 (First Amendment). Although a State may “choos[e] to fund a program dedicated to advance certain permissible goals,” Rust, 500 U. S., at 194, it is not “permissible” for a State to use its spending power to advance an interest that—even if legitimate “in the absence of the NLRA,” Gould, 475 U. S., at *74 290—frustrates the comprehensive federal scheme established by that Act.

NLRB Regulation

We have characterized Machinists pre-emption as “creating] a zone free from all regulations, whether state or federal.” Boston Harbor, 507 U. S., at 226. Stressing that the NLRB has regulated employer speech that takes place on the eve of union elections, the Court of Appeals deemed Machinists inapplicable because “employer speech in the context of organizing” is not a zone of activity that Congress left free from “all regulation.” See 463 F. 3d, at 1089 (citing Peoria Plastic Co., 117 N. L. R. B. 545, 547-548 (1957) (barring employer interviews with employees in their homes immediately before an election); Peerless Plywood Co., 107 N. L. R. B. 427, 429 (1953) (barring employers and unions alike from making election speeches on company time to massed assemblies of employees within the 24-hour period before an election)).
The NLRB has policed a narrow zone of speech to ensure free and fair elections under the aegis of § 9 of the NLRA, 29 U. S. C. § 159. Whatever the NLRB’s regulatory authority within special settings such as imminent elections, however, Congress has clearly denied it the authority to regulate the broader category of noncoercive speech encompassed by AB 1889. It is equally obvious that the NLRA deprives California of this authority, since “‘[t]he States have no more authority than the Board to upset the balance that Congress has struck between labor and management.’ ” Metropolitan Life Ins. Co. v. Massachusetts, 471 U. S. 724, 751 (1985).

Federal Statutes

Finally, the Court of Appeals reasoned that Congress could not have intended to pre-empt AB 1889 because Congress itself has imposed similar restrictions. See 463 F. 3d, at 1090-1091. Specifically, three federal statutes include *75 provisions that forbid the use of particular grant and program funds “to assist, promote, or deter union organizing.”[2] We are not persuaded that these few isolated restrictions, plucked from the multitude of federal spending programs, were either intended to alter or did in fact alter the “ ‘wider contours of federal labor policy.’” Metropolitan Life, 471 U. S., at 753.
A federal statute will contract the pre-emptive scope of the NLRA if it demonstrates that “Congress has decided to tolerate a substantial measure of diversity” in the particular regulatory sphere. New York Telephone, 440 U. S., at 546 (plurality opinion). In New York Telephone, an employer challenged a state unemployment system that provided benefits to employees absent from work during lengthy strikes. The employer argued that the state system conflicted with the federal labor policy “of allowing the free play of economic forces to operate during the bargaining process.” Id., at 531. We upheld the statute on the basis that the legislative histories of the NLRA and the Social Security Act, which were enacted within six weeks of each other, confirmed that “Congress intended that the States be free to authorize, or to prohibit, such payments.” Id., at 544; see also id., at 547 (Brennan, J., concurring in result); id., at 549 (Blackmun, J., concurring in judgment). Indeed, the tension between the Social Security Act and the NLRA suggested that the case could “be viewed as presenting a potential conflict between two federal statutes . . . rather than between federal and state regulatory statutes.” Id., at 539-540, n. 32.
*76 The three federal statutes relied on by the Court of Appeals neither conflict with the NLRA nor otherwise establish that Congress “decided to tolerate a substantial measure of diversity” in the regulation of employer speech. Unlike the States, Congress has the authority to create tailored exceptions to otherwise applicable federal policies, and (also unlike the States) it can do so in a manner that preserves national uniformity without opening the door to a 50-state patchwork of inconsistent labor policies. Consequently, the mere fact that Congress has imposed targeted federal restrictions on union-related advocacy in certain limited contexts does not invite the States to override federal labor policy in other settings.
Had Congress enacted a federal version of AB 1889 that applied analogous spending restrictions to all federal grants or expenditures, the pre-emption question would be closer. Cf. Metropolitan Life, 471 U. S., at 755 (citing federal minimum labor standards as evidence that Congress did not intend to pre-empt state minimum labor standards). But none of the cited statutes is Governmentwide in scope, none contains comparable remedial provisions, and none contains express pro-union exemptions.
The Court of Appeals’ judgment reversing the summary judgment entered for the Chamber of Commerce is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The District Court held that the Chamber of Commerce lacked standing to challenge several provisions of AB 1889 concerning state contractors and public employers. See Chamber of Commerce v. Lockyer, 225 F. Supp. 2d 1199, 1202-1203 (CD Cal. 2002).

 See 29 U. S. C. § 2931(b)(7) (“Each recipient of funds under [the Workforce Investment Act of 1998] shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing”); 42 U. S. C. § 9839(e) (“Funds appropriated to carry out [the Head Start Programs Act] shall not be used to assist, promote, or deter union organizing”); § 12634(b)(1) (“Assistance provided under [the National Community Service Act of 1990] shall not be used by program participants and program staff to . .. assist, promote, or deter union organizing”).