SUTTON, J.,
concurring in part and dissenting in part.
I agree with the majority that Thomas King’s remarks to Daniel Gahman amounted to an unfair labor practice. But I respectfully disagree with its conclusion that King’s speeches at the pre-election employee meetings did not constitute protected employer speech under § 8(c) of the NLRA, 29 U.S.C. § 158(c).
Section 8(a)(1) of the NLRA bars employers from taking actions that “interfere with, restrain, or coerce employees in the exercise of’ an employee’s right to organize and participate in union representation. 29 U.S.C. § 158(a)(1). In the statute’s early years, the Board interpreted § 8(a)(1) expansively, “condemning] almost any anti-union expression by an employer.” Crown Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1138 (D.C.Cir.1994) (internal quotation marks omitted). Concerned that the Board’s “aggressive enforcement of § 8(a)(1) had made it excessively difficult for employers to engage in any form of non-coercive communications with employees regarding the merits of unionization,” Allegheny Ludlum Corp. v. NLRB, 104 F.3d 1354, 1361 (D.C.Cir.1997), and concerned about the infringement of the employer’s free-speech rights, cf. Necia Mining Co. v. NLRB, 564 F.2d 309, 313 & n. 6 (9th Cir.1977), Congress in 1947 added a new provision to limit § 8’s scope— § 8(c), Labor-Management Relations Act, ch. 120, sec. 101, § 8(c), 61 Stat. 136, 142 (1947) (codified at 29 U.S.C. § 158(c)). Under the new provision, “[t]he expressing of any views, argument, or opinion shall not constitute or be evidence of an unfair labor practice ... if it contains no threat of reprisal or force or promise of benefit.” 29 U.S.C. § 158(c).
Section 8(c) not only levels the field between advocacy for union organization and advocacy against it, but the provision also “implements the First Amendment.” NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); see also United Food & Commercial Workers Union Local 204 v. NLRB, 506 F.3d 1078, 1081 (D.C.Cir.2007). Both objectives further the end of making “[c]ollective bargaining ... work” by allowing “labor and management ... to exercise their right to engage in uninhibited, robust, and wide-open debate,” Steam Press Holdings, Inc. v. Hawaii Teamsters, 302 F.3d 998, 1009 (9th Cir.2002) (internal quotation marks omitted); see also Healthcare Ass’n of N.Y. State, Inc. v. Pataki, 471 F.3d 87, 98-99 (2d Cir.2006), and by encouraging “freewheeling use of the written and spoken word,” Chamber of Commerce v. Brown, — U.S. -, 128 S.Ct. 2408, 2413-14, 171 L.Ed.2d 264 (2008).
By ensuring that unionization campaigns involve a neutral dialogue rather than a one-sided monologue, § 8(c) “serves a labor law function of allowing employers to present an alternative view and information that a union would not present.” Healthcare Ass’n, 471 F.3d at 98. Opening lines of communication “aids the workers by allowing them to make informed decisions” based not only on the union’s own assertions but also on “a reasoned critique of their unions’ performance.” Id. at 99 (internal quotation marks omitted). And uninhibited discourse levels the playing field for the employer, whose “only effective way of arguing against the union is ... to point out to the workers the adverse consequences of unionization.” NLRB v. Pentre Elec., Inc., 998 F.2d 363, 369 (6th Cir.1993) (internal quotation marks omitted), abrogated on other grounds by Holly Farms Corp. v. NLRB, 517 U.S. 392, 409, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996); cf. Boaz Spinning Co. *499 v. NLRB, 439 F.2d 876, 878 (6th Cir.1971). Consistent with the free-speech principles underlying § 8(c), we have applied this rule in favor of speech by management, see Pentre, 998 F.2d at 368-71, and in favor of speech by a union president, see NLRB v. Constr. & Gen. Laborers’ Union Local No. 534, 778 F.2d 284, 290-91 (6th Cir.1985) (reversing Board’s decision that a union president’s speech amounted to an unfair labor practice and holding it was protected where the president “did not explicitly threaten that [the union] would take some action against persons who file unfair labor practice charges” but instead “the action threatened was action that would have been taken by an independent third party with no instigation or assistance from the Union,” his statements did not contain “some implied threat that the Union or its members would take some action against persons who file charges” and the Board did not find his statements were “false”).
Section 8(c) thus confirms that “an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union.” Gissel, 395 U.S. at 618, 89 S.Ct. 1918. And an employer “may even make a prediction as to the precise effects he believes unionization will have on his company” if it is “carefully phrased on the basis of objective fact” and is designed “to convey an employer’s belief as to demonstrably probable consequences beyond his control.” Id. (emphasis added).
Threats of reprisal by an employer, by contrast, serve none of these objectives and indeed add nothing of value to the dialogue Congress sought to foster. That is why § 8(c) offers no safe harbor to statements that “could easily and understandably be perceived as veiled threats of retaliation,” and an employer “cannot obtain the protection of section 8(c) simply by labeling [such] statements ‘opinion.’ ” Peabody Coal v. NLRB, 725 F.2d 357, 363 (6th Cir.1984); see also NLRB v. Price’s Pic-Pac Supermarkets, Inc., 707 F.2d 236, 240 (6th Cir.1983).
But that does not mean every employer’s prediction of hard times (and potentially lost work for employees) flowing from unionization amounts to an impermissible threat of reprisal or retaliation. There is a difference between a prediction that unionization will hurt the company’s business and a threat to retaliate against employees if they unionize. When the employer’s prediction concerns a consequence over which he has no control, that by definition cannot constitute a “threat of reprisal,” namely a threat of retaliation. “[E]mployees may not reasonably conclude that they are being coerced where the [employer’s] opinions refer to matters over which the speaker has no control.” Pen-tre, 998 F.2d at 369. What divides protected predictions from prohibited threats of reprisal, then, is whether the employer’s speech contains an “implication that [the] employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him.” Gissel, 395 U.S. at 618, 89 S.Ct. 1918 (emphasis added); see also id. at 619, 89 S.Ct. 1918. Only a statement that “conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus” falls outside § 8(c)’s protective scope. Pentre, 998 F.2d at 371. As Judge Friendly and “the dictionaries tell us, a ‘threat of reprisal’ means a ‘threat of retaliation’ and this in turn means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in return for an injury — ‘to return evil for evil.’ ” NLRB v. Golub Corp., 388 F.2d 921, 928 (2d Cir.1967). The burden rests on the Board to prove that § 8(c) does not protect a particular statement, not on the *500 employer to prove the opposite. See Pentre, 998 F.2d at 371.
Our cases consistently have stood by this rule. On the one side of the line, where an employer tells employees that the company will terminate them if they unionize, the statement receives no protection. See, e.g., Dayton Newspapers, Inc. v. NLRB, 402 F.3d 651, 660 (6th Cir.2005); Ind. Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1298-99 (6th Cir.1988). On the other side of the line, where an employer expresses his view that unionizing a company or plant will lead to consequences beyond the employer’s control — such as current or prospective customers’ likely responses to dealing with a unionized supplier — his statements fall within § 8(c)’s safe harbor.
Pentre sharpens the distinction. Company officials gave speeches to the effect that unionization would severely undercut the company’s customer base. See id. at 369-70. Although the company’s leaders never promised plant closure or layoffs, they said that they were “ ‘not prepared’ to endure the hardships of rebuilding a customer base,” strongly suggesting that the workers’ tenure would be short-lived if the union won. Id. Pentre held that the statements still received protection because the speakers never said the company would retaliate for employees’ exercise of their statutory rights. “Not a shred of evidence indicates that [the speakers] predicted these consequences based on matters within [their] own volition or control,” and the “record [was] simply devoid of any evidence that [the speakers] suggested ... they would close [the company] as a means to punish employees if they voted in favor of the union.” Id. at 370. “No employee,” as a result, “could reasonably have come away from [the employers’ speeches] with the belief that antiunion sentiment on the part of the company could lead to closure if the employees voted in favor of the union.” Id.; see also NLRB v. Vemco, 989 F.2d 1468, 1489 (6th Cir.1993) (holding that an employer’s statement that unionization would result in a work shortage resulting in reduced hours or layoffs was a permissible, objective prediction, and thus protected speech under § 8(c), where nothing suggested that the expected work shortage “was within [the employer’s] control” or that the employer “would implement a cutback in hours or a layoff solely on its own initiative for reasons unrelated to the economic necessity of adjusting to a shortage of work”); accord Be-Lo Stores v. NLRB, 126 F.3d 268, 285-86 (4th Cir. 1997); Gen. Elec. Co. v. NLRB, 117 F.3d 627, 633 (D.C.Cir.1997); NLRB v. Vill. IX, 723 F.2d 1360, 1368-69 (7th Cir.1983); Patsy Bee, Inc. v. NLRB, 654 F.2d 515, 518 (8th Cir.1981); cf. Crown Cork, 36 F.3d at 1138-39, 1144-46 (collecting cases and cataloguing statements that, federal courts have held protected by § 8(c)).
This principle, it seems to me, should make short work of this case. As recounted by the employees whose testimony the ALJ credited, King told the employees at the meetings that it was their own choice whether to unionize, explained the company’s sole-source relationships and just-in-time manufacturing model, expressed his “expectation” that if DTR became unionized, the company’s sole-source, just-in-time customers would seek other suppliers to prevent production-flow interruptions in the event of a strike, JA 275, and predicted that this would result in less work to go around at DTR and thus lead to layoffs, see JA 76-77 (employee agreeing that King’s message was that “customers would have to evaluate whether to keep DTR as the sole source supplier” based on reliability concerns, and “if the customers pulled some business away from DTR because of this fear of reliability, that would mean there would be less work and fewer jobs at DTR”); JA 275 (employee agreeing that “the concern [King] expressed was about *501 actions the customers might take” and “when ... [King] mentioned layoffs, the layoffs would be because customers pulled part or all of their business out of DTR and there wasn’t enough work to go around”).
Nothing in King’s remarks amounted to a “threat of reprisal,” as this court and other courts have construed the phrase. The whole point of his statements was that other factors — the decisions of clients— would cause a slowdown in business and eventually job layoffs, not that the company vindictively planned to lay off workers, whether business slowed down after unionization or not. The predicted economic consequences — a severe reduction in the company’s business leading in turn to layoffs — simply did not encompass anything within DTR’s control. Cf. Vemco, 989 F.2d at 1489. That a company may be forced by a loss of business to lay off workers does not make its action a voluntary one in the sense that Gissel described. See Crown Cork, 36 F.3d at 1137 (“The fact that an identifiable manager, and not an invisible hand, makes these decisions (subject to sanction by the market if he or she makes them incompetently), does not mean that they are any less ‘economic necessities’ or ‘beyond his control’ in the sense those phrases are used by Gissel. ”).
But even if there were uncertainty about the guidance these cases offer, our application of these principles to the same employer, the same union and strikingly similar statements ought to suffice to resolve this ease. Fourteen years ago, we decided DTR Industries, Inc. v. NLRB (DTR I), 39 F.3d 106 (6th Cir.1994), which involved an attempt by the same union, the UAW, to unionize the same DTR plant, see id. at 109. A week before the election, the company’s then-president, Yuji Kobayashi, sent a letter to the plant’s employees arguing that because the company’s success depended heavily on its sole-source relationships with just-in-time manufacturers, unionization would seriously harm its business, possibly requiring layoffs. Id. Koba-yashi told the employees that DTR’s “business would automatically be reduced if the union wins the election and our customers took away 50 percent of our sole source business.” Id. (internal quotation marks omitted). Those customers, he added, who did not turn to other suppliers would likely require DTR to produce and maintain a 90-day inventory when each collective-bargaining agreement approached its expiration — an experience that, if other companies’ experience was any guide, would lead to layoffs. See id.
The union alleged, and the Board found, that Kobayashi’s letter and the other supervisors’ statements amounted to unlawful threats of reprisal and thus constituted an unfair labor practice. Id. at 110. We disagreed. “Kobayashi[’s] letter,” we explained, “taken in context, is an objective prediction of what the petitioner’s customers would do in the event the union prevailed, and thus is protected speech.” Id. at 114. The letter set forth the basis for Kobayashi’s prediction, explaining the company’s sole-source business and the reasons customers would diversify their portfolios of suppliers, and we noted that Kobayashi “was entitled to make this statement based on his industry experience and his knowledge of [DTR’s] customer base.” Id. The Board offered nothing to show that Kobayashi’s statements were either untruthful or “subjective” as we defined that term in Pentre, see id.— i.e., that the statement “conveys that the employer will act on its own initiative to punish employees as the result of anti-union animus,” Pentre, 998 F.2d at 371.
Our decision in DTR I fully answers the questions raised by this case.- King, like Kobayashi, explained the nature of the company’s sole-source business, his expec *502 tations that unionization would lead the company’s customers to redirect business to other suppliers and his view that this would lead to layoffs. Cf. 39 F.3d at 109; DTR Industries, Inc., 311 NLRB 833, 833 (1993) (reprinting portions of Kobayashi’s letter). Just as we held Kobayashi’s statements entitled to § 8(c)’s protection, so too we should hold King’s statements entitled to protection.
In reaching the opposite conclusion, the majority attempts to distinguish King’s and Kobayashi’s statements. The language of Kobayashi’s letter, it says, “did not guarantee” that DTR’s customers would “tak[e] away 50 percent of the sole-source business.” Maj. Op. at 494. But of course Kobayashi did not guarantee that unionization would cause the company to lose a specific percentage of business. How could he do that, or for that matter how could anyone do that? What matters is that he plainly promised that unionization would decrease DTR’s business. “Bringing a union,” he said, “would lose business for DTR.” DTR Indus., 311 NLRB at 833. “Having a union,” he added, “will hurt our business and our chances for success. We will lose some or all of our sole source business----” DTR I, 39 F.3d at 109. The 50% loss was one way of estimating what would happen and one way of illustrating why jobs would be lost. Kobayashi, indeed, was hardly fixated on a 50% estimate, as he raised more ominous possibilities later, saying that DTR’s customers might “take [the company’s business] all away and sole source with some non-union company.” DTR Indus., 311 NLRB at 833. Viewed from the perspective of employees prone “to pick up intended implications ... that might be more readily dismissed by a more disinterested ear,” Gissel, 395 U.S. at 617, 89 S.Ct. 1918, his words left no doubt that unionization would cause the company to lose a substantial amount of, if not all of, its sole-source business.
In a similar vein, the majority insists that Kobayashi, unlike King, never “explicitly raised the spectre of DTR layoffs.” Maj. Op. at 495. Yet Kobayashi’s letter explicitly did mention layoffs. See DTR Indus., 311 NLRB at 833. To be sure, he did not guarantee that layoffs would result from unionization, but neither did Kong; they both made predictions about the effect unionization would have on business and, in turn, jobs. The key point is this: Gissel tells us to stand in the employees’ shoes when gauging the effect of Kobaya-shi’s and King’s words, and both permitted an employee to infer that unionization would cause a drop-off in business, which would lead to layoffs.
Beyond the words King and Kobayashi used, the majority argues that differences in the contexts of their statements sets them apart. See Maj. Op. at 495-96. Context no doubt can be crucial to understanding the meaning that an employer’s statement carries. See Ind. Cal-Pro, 863 F.2d at 1299. But as the Board bears the burden of proving a statement unprotected by § 8(c), Pentre, 998 at 371, it must demonstrate why the context of King’s statements made them threats of reprisal while Kobayashi’s letter (and other supervisor’s statements) in a nearly identical scenario did not. In trying to meet this burden, the Board noted that Kobayashi’s “letter explained that [his] perspective was based upon his industry experience and knowledge of [DTR’s] customer base,” while King’s speeches did not. JA 2. But that purported distinction misreads our decision in DTR I: While we pointed out that Kobayashi’s experience and knowledge “entitled” him to make the statements in his letter, we never mentioned (much less rested our decision upon) the letter’s recitation of his qualifications. See DTR I, 39 F.3d at 114. And although we defer to the Board’s interpretations of the statutes it administers, we do not give it the benefit of the doubt in interpreting our prece *503 dents. See Albertson’s, Inc. v. NLRB, 301 F.3d 441, 448 (6th Cir.2002).
But, the majority adds, Kobayashi was the company president when he wrote his letter, Maj. Op. at 495, while King served as the company’s chief human-resources officer. Thus, it continues, while Kobaya-shi “no doubt knew the economic condition at DTR,” id. at 496, as his “privileged position at the company gave him industry experience and knowledge of [DTR’s] customer base,” id. at 495 (internal quotation marks omitted), there is no reason to believe that King had any similar knowledge, and thus his “statement was made without objective facts for actually believing that plants might close if employees voted in the union,” id. at 495 (internal quotation marks and alteration omitted). Yet § 8(c) protects “the expressing of any views, argument, or opinion,” 29 U.S.C. § 158(c), and we have never suggested that these words require employers to exercise them freedom of speech only through pre-vetted economic experts or that § 8(c)’s protection otherwise depends on the status of the speaker. To the contrary, we held in DTR I that § 8(c) protected the statements of three low-level supervisors who told employees that unionization would lead to a drastic loss of business from two of the company’s three largest sole-source customers. See 39 F.3d at 109,114-15.
Even though King was not the president of the company, I fail to understand why he lacked a sufficient basis to make his observations for an independent reason. He attended Kobayashi’s presentations during the 1989 union campaign, which may explain why he spoke this time around. He observed the ensuing proceedings that culminated in DTR I. And he had served as the company’s top human-resources officer for over a decade. Far from being in the dark about the labor-related options at DTR’s disposal “to deal with drop-offs in business,” King would have been in an ideal position to understand and “assess the viability of alternative measures” to layoffs. Maj. Op. at 495 (internal quotation marks omitted).
In condemning King’s statements because he presented “no objective evidence ... supporting [his] statement that unionization would result or even could result in an objectively required economic closing of the plant,” id. at 496 (internal quotation marks omitted), the majority asks more of DTR than our cases — including DTR I— demand. Just as King did not accompany his remarks with empirical evidence supporting his personal views and predictions, neither did Kobayashi. To construe § 8(c) as imposing on employers the burden of proving objectively the truth of every assertion they make would contravene both the language of the statute — which encompasses “any views, argument, or opinion,” 29 U.S.C. § 158(c) — and its purpose, see Pentre, 998 F.2d at 371 (“Requiring an employer to present, in advance and without a request from the Board, evidence to corroborate its predictions would, in our mind, defeat the integral purpose of section 8(c).”). If, as the Supreme Court has said, the purpose of the statute is to foster “uninhibited, robust, and wide-open debate in labor disputes” through “freewheeling use of the written and spoken word,” Chamber of Commerce, 128 S.Ct. at 2414 (internal quotation marks omitted), I am hard-pressed to understand how this objective-evidence requirement is consistent with that goal.
At the end of the day, Kobayashi’s and King’s statements must stand or fall together. Either both crossed the line from protected speech to prohibited threats of reprisal, or both stayed within § 8(c)’s shield. Absent a meaningful distinction between the two statements, the answer to the two cases must be the same. Neither *504 the statements of Kobayashi, nor of his underlings nor of King amounted to “threats of reprisal,” and accordingly DTR II should come out the same way as DTR I. Pentre, 998 F.2d at 371.
What ultimately separates us in this case is the meaning of threats of “reprisal.” As I read Gissel, Pentre and DTR I, they define the term just the way the dictionaries do — as requiring a threat to punish employees or to retaliate against them for voting for unionization, something that simply is not covered when the employer warns that unionization will cause a drop off in business and will lead to layoffs. When an employer threatens punishment or retaliation if employees vote for unionization, by contrast, he communicates that layoffs will result no matter what happens to the business — that layoffs will follow in spite of, not because of, potential declines in business. All of this, the majority says, is a “false dichotomy.” Maj. Op. at 492-93 n. 2. But why that is so is never explained, much less supported by the case law. Consistent with the case law and the plain meaning of “reprisal,” the dichotomy is the fulcrum upon which the case turns and which the statute’s text and controlling precedent put front-and-center: What matters is whether King’s statements conveyed a promise or even the possibility that DTR would “punish” its employees for unionizing — by laying off workers irrespective of, or beyond the extent of, the uncontrollable impact unionization would have on DTR’s business. Cf. Gissel, 395 U.S. at 618, 89 S.Ct. 1918 (holding statements unprotected “[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him”); Pentre, 998 F.2d at 369, 371 (explaining that a “statement is an unlawful threat” if it “is subjectively phrased in that it conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus”). King’s words, like Kobayashi’s words before him, did no such thing, and the employees in attendance did not suggest otherwise. Whatever else can be said about King’s remarks, they cannot be characterized as “threat[s] of reprisal,” 29 U.S.C. § 158(c); Gissel 395 U.S. at 618, 89 S.Ct. 1918. The majority seeing these issues differently, I respectfully dissent.