STAHL, Circuit Judge,
concurring.
In my opinion, this Ordinance will do little to accomplish its stated purpose of protecting and promoting tourism in the City of Providence. In fact, I fear that the Ordinance, which interferes with an employer’s ability to make hiring and firing decisions in the critical first three months of its operations, will negatively affect Providence’s tourism industry by deterring companies from doing business in the City.[26] But our task in this case, as the majority emphasizes at the conclusion of its opinion, is not to pass judgment on the reasonableness of the Ordinance as a policy. See Livadas v. Bradshaw, 512 U.S. 107, 120, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). Rather, we must decide whether the Ordinance conflicts with federal law. Id. I join the majority’s opinion because Plaintiffs have not convinced me that the Ordinance is preempted by the NLRA under existing case law. Because I would take a different path to reach the majority’s conclusion, however, I write separately-
I begin by noting that Plaintiffs’ claims under the Garmon preemption doctrine, the Contracts Clause, and the Equal Pro *42 tection Clause are largely without merit, and I join the majority’s opinion as to those claims. The fundamental issue here is whether the Ordinance is preempted under the Machinists preemption doctrine. See Lodge 76, Int’l Ass’n of Machinists v. Wis. Emp. Relations Comm’n, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).
The Machinists doctrine has come to apply when a court can discern, from the text or structure of the NLRA, that Congress intended to leave a subject free from state or local regulation. Cal. Grocers Ass’n v. City of Los Angeles, 52 Cal.4th 177, 127 Cal.Rptr.3d 726, 254 P.3d 1019, 1027 (2011). In practice, the cases in which the Supreme Court has found Machinists preemption thus far have involved states or localities attempting to actively intervene in the union organizing or collective bargaining processes. See Machinists, 427 U.S. 132, 96 S.Ct. 2548 (finding preempted a state’s act of enjoining union members from refusing to work overtime); Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (finding preempted a city council’s conditioning of a franchise renewal on the resolution of an ongoing labor dispute); Chamber of Commerce v. Brown, 554 U.S. 60, 68,128 S.Ct. 2408, 171 L.Ed.2d 264 (2008) (finding preempted a state’s attempt to regulate speech about union organizing, despite an “explicit direction from Congress to leave noncoercive speech unregulated”).
On the other hand, there are two cases of relevance here in which the Supreme Court has declined to find Machinists preemption. Both cases involved state or local laws that regulated particular terms of the employment relationship itself; the Court found these regulations to be permissible “minimum labor standards.” See Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (upholding a Massachusetts law requiring that employee health care plans include certain minimum mental health benefits); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (upholding a Maine law guaranteeing employees severance payments in the event of a plant closing). Reasoning that the goal of the NLRA is to regulate the process by which parties negotiate an employment agreement and not the substance of the agreement itself, Metro. Life, 471 U.S. at 753, 105 S.Ct. 2380, the Court has sanctioned state and local regulations that impose “minimal substantive requirements on contract terms,” id. at 754, 105 S.Ct. 2380. Such minimum labor standards are a lawful exercise of a state’s authority “to regulate the employment relationship to protect workers within the State.” DeCanas v. Bica, 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).
Against that legal backdrop, Plaintiffs have alleged that the Ordinance is preempted under Machinists because it interferes with the goals of the NLRA by: (1) making it more likely that a new employer will be deemed a successor; (2) enhancing the bargaining power of unions by giving employees benefits for which they would otherwise have had to bargain; and (3) limiting an employer’s right to hire and fire. I will address each argument in turn.
1. Successorship
First, Plaintiffs argue that the Ordinance impermissibly increases the chances that a new employer inheriting a unionized workforce under the Ordinance will be deemed a “successor” and thus forced to recognize and bargain with the union representing its predecessor’s employees. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 96 *43 L.Ed.2d 22 (1987). I believe that the majority has properly analyzed the successor-ship issue and have little to add on this point. Under the reasoning of Fall River Dyeing and M & M Parkside Towers LLC, No. 29-CA-27720, 2007 WL 313429 (N.L.R.B. Jan. 30, 2007) (ALJ opinion), the NLRB should not find that successorship attaches to an employer affected by the Ordinance who takes over a unionized workforce. Should the NLRB find otherwise, Defendants conceded at oral argument that the Ordinance would likely be preempted, and the employer would have a cause of action in state or federal court, which I believe would be successful. Plaintiffs’ second and third arguments, however, seem to me to present closer questions.
2. Bargaining Power
Plaintiffs’ next argument is that the Ordinance interferes with the collective bargaining process by skewing the balance of power in favor of employees. Specifically, Plaintiffs argue that the Ordinance grants retained employees a right for which they would otherwise have had to bargain: three months of good cause employment.[27] It does seem indisputable that many employees will receive a benefit from the Ordinance for which they would otherwise have had to bargain. That alone, however, does not suffice to support a claim of preemption, “for there is nothing in the NLRA which expressly forecloses all state regulatory power with respect to those issues that may be the subject of collective bargaining.” Fort Halifax, 482 U.S. at 21-22, 107 S.Ct. 2211 (citation and internal quotation marks omitted). The question is therefore whether, as Plaintiffs claim, the Ordinance has “entered into the substantive aspects of the bargaining process to an extent Congress has not countenanced.” Machinists, 427 U.S. at 149, 96 S.Ct. 2548 (citation and. internal quotation marks omitted).
This case is certainly distinguishable from Machinists, Golden State, and Brown, in which the Supreme Court found preemption because a state or locality had directly intervened in an ongoing labor dispute or attempted to regulate speech about union organizing. Those strike me as clear interferences with “substantive aspects of the bargaining process.” Machinists, 427 U.S. at 149, 96 S.Ct. 2548. I therefore believe that this issue turns on whether the Ordinance’s more subtle effects on the bargaining process make it sufficiently akin to the regulations upheld in Metropolitan Life and Fort Halifax that it, too, can withstand preemption.
Because the NLRA is primarily concerned with establishing an equitable bargaining process and not with the substantive terms of the resulting bargain, Metro. Life, 471 U.S. at 753,105 S.Ct. 2380, states have some latitude to regulate the employment relationship pursuant to their police powers, id. at 756, 105 S.Ct. 2380. The Supreme Court found in Metropolitan Life that the NLRA was meant to equalize the balance of bargaining power between employers and employees in an effort to increase wage rates and decrease the gap between wages and profits. Id. at 753-54, 105 S.Ct. 2380. As the Court noted:
*44 The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement.
Id. at 754, 105 S.Ct. 2380. Metropolitan Life stands for the principle that “[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act.” Id. at 757,105 S.Ct. 2380.
Unfortunately, the Supreme Court has not provided much guidance as to what distinguishes a minimum labor standard from an unconstitutional regulation of the collective bargaining or self-organization processes. The Court has simply suggested that a minimum labor standard “provides protections to individual union and nonunion workers alike, and thus ‘neither encourage[s] nor discourage[s] the collective-bargaining processes that are the subject of the NLRA.’” Fort Halifax, 482 U.S. at 20-21,107 S.Ct. 2211 (quoting Metro. Life, 471 U.S. at 755, 105 S.Ct. 2380).
The Ordinance’s protections apply equally to unionized and non-unionized workers. That neutrality does seem essential to the Ordinance’s validity. Cal. Grocers, 127 Cal.Rptr.3d 726, 254 P.3d at 1031 n. 7. The Ordinance does not tip the balance in favor of one category of workers, or force “employees to choose between exercising their right to enter a collective bargaining agreement and having their state-granted employment rights enforced,” either of which might constitute an unlawful intrusion into the collective bargaining process. Id.
Nor have Plaintiffs convinced me that the Ordinance otherwise encourages or discourages the collective bargaining process in a way that Congress did not countenance. Certainly, when a state enacts a minimum labor standard, the state is at least marginally discouraging collective bargaining by incentivizing employers and employees to lobby the legislature, rather than negotiate with each other, to achieve their goals. But Machinists does not seem to foreclose such a marginal impact on collective bargaining. In Metropolitan Life, the Massachusetts law completely prevented any bargaining on the subject of minimum mental health benefits, but the Court found that mandated-benefit laws are “minimum standards independent of the collective-bargaining process that devolve on employees as individual workers, not as members of a collective organization.” Id. at 755, 105 S.Ct. 2380 (citation and internal quotation marks omitted). Similarly, here, the Ordinance provides a benefit to workers in their individual capacities and not based on their membership in a union. Furthermore, as a practical matter, there would be no point in bargaining for the Ordinance’s specific protections, because those protections are temporary in nature, and a collective bargaining agreement cannot bind a new employer without the new employer’s assent. Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 261, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).
The Ordinance does seem, at first glance, to encourage the collective bargaining process by providing unions with a three-month period in which to quickly organize retained workers, who will have an incentive to unionize because they could be about to lose their jobs. Because Plaintiffs did not make this argument, however, it is waived. United States v. Zannino, 895 F.2d 1,17 (1st Cir.1990). Furthermore, even if Plaintiffs had made the argument, I *45 do not think it would succeed. To avoid having retained employees vote to unionize during the three-month period, I believe an employer need only give the employees a firm end date. Temporary employees whose departure date is definite are ineligible to vote in representation elections. See NLRB v. New England Lithographic Co., 589 F.2d 29, 32-34 (1st Cir.1978). This “date certain” test is meant to promote the NLRB policy of including in representation elections only those employees who are “sufficiently concerned with the terms and conditions of employment” to warrant their participation. Id. at 34 (citation and internal quotation marks omitted).[28] Thus, even if the Ordinance were to encourage collective bargaining in theory, I do not believe it will do so in practice.
Of course, the Ordinance is distinguishable from the law upheld in Metropolitan Life, which was intended to provide mental health treatment to less wealthy residents of the Commonwealth and which strikes me as falling more squarely within the state’s power to promote public health and safety. See Metro. Life, 471 U.S. at 756, 758, 105 S.Ct. 2380. And while the majority is correct that Plaintiffs have not helpfully distinguished the Ordinance from the mandatory severance law upheld in Fort Halifax, I can imagine some crucial distinctions. For example, a mandatory severance law does not expose the employer to the possibility of having its workers unionize, file grievances, or file employment discrimination claims. Nor does a mandatory severance law entail the same tax or insurance liabilities for the employer.
Nonetheless, in the final accounting, I believe that the Ordinance has at most a minimal impact on the collective bargaining process and is thus more comparable to the regulations upheld in Metropolitan Life and Fort Halifax than those struck down in Machinists, Golden State, and Brown. I therefore hesitantly conclude that the basic rule of Metropolitan Life applies here: a state or locality can regulate certain terms of the employment relationship, as long as the regulation affects union and non-union workers equally and does not substantively interfere with the self-organization or collective bargaining processes. 471 U.S. at 751-57, 105 S.Ct. 2380.
3. Hiring and Firing
A minimum labor standard must not, however, be incompatible with the general goals of the NLRA. Id. at 757, 105 S.Ct. 2380. The Supreme Court found in Machinists that Congress left certain conduct unregulated by the NLRA because it was meant “to be controlled by the free play of economic forces.” 427 U.S. at 140, 96 S.Ct. 2548 (citation and internal quotation marks omitted). Plaintiffs’ third argument is that an employer’s right to make hiring and firing decisions is part of that free zone. The majority repeatedly describes the Ordinance’s impact on an employer’s hiring ability as “limited.” I respectfully disagree. The Ordinance imposes a workforce upon affected employers during the critical first three months of their business operations. Though an employer need only retain as many employees as are “necessary for its full operation,” the employer must fill each of those positions with the predecessor’s employees, whom the new employer played no role in selecting. After three months, should the new employer choose not to retain the predecessor’s workers, it must replace those *46 workers "with other employees and train the new employees, which will undoubtedly cause upheaval.
The Ordinance’s impact on an employer’s ability to fire retained employees is similarly significant. Though an employer can discharge retained employees during the three-month period, it can only do so for good cause, which functions as a very real restraint. The majority dismisses this impact as speculative and limited, but it seems to me unquestionable that certain employers who would otherwise have hired employees under an at-will agreement will, under the Ordinance, inherit a workforce that can only be terminated for cause. The three-month duration of the retention period will provide that employer with little comfort, as the employer will face potential challenges to any termination decisions it makes during the three-month period and will have to justify those decisions under the heightened good-cause standard.
Having recognized that the Ordinance’s impact on an employer’s ability to hire and fire is significant, however, I do agree with the majority that the NLRA does not seem to prohibit that impact. In support of their argument, Plaintiffs rely on carefully-selected language from NLRB v. Bums International Secmity Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), Howard Johnson, and Fall River Dyeing.[29] In all three of those cases, however, the Supreme Court was addressing the need for a new employer to consciously take on successorship obligations, which we have determined are not at issue here. None of those cases purported to address “whether a successor’s hiring choices might be regulated or restricted by sources other than an existing collective bargaining agreement or federal common law.” Cal. Grocers, 127 Cal.Rptr.3d 726, 254 P.3d at 1033. Burns, Howard Johnson, and Fall River Dyeing establish that the NLRA does not require an employer to hire its predecessor’s employees; those cases do not grant employers an unfettered right to hire and fire, immune from state or local regulation. Thus, while Plaintiffs’ argument is not without persuasive value,[30]1 do not believe it is supported by existing jurisprudence.
There is a general presumption against preemption, which is particularly strong here. See Fort Halifax, 482 U.S. at 21, 107 S.Ct. 2211 (“[P]re-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State.”) In that context, and considering the employee-focused nature of the NLRA, see NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893 (1937), I do not believe we can infer that, where the successorship doctrine does not apply, Congress intended to *47 leave the area of hiring and firing to be fully controlled by the free play of economic forces.
While I ultimately conclude that the Ordinance is a permissible exercise of the City’s power to regulate the employment relationship and protect its workers, I find this to be a very close case. The Ordinance is not entirely on all fours with any of the regulations that the Supreme Court has upheld in its Machinists decisions. The case law gives us few clear rules to follow, leaving preemption somewhat in the eye of the beholder. Though I must agree with the majority that this particular regulation does not seem to be preempted by the Machinists doctrine under existing precedent, I do hope the Supreme Court will provide some guidance as to just how far a state or locality can go in the name of a “minimum labor standard.”

. Indeed, Plaintiffs have alleged that the Ordinance has already constrained their efforts "to attract vendors who may be able to provide hotel and restaurant services in a more efficient and cost-effective manner.”

. Plaintiffs also argue that the Ordinance disrupts the balance of power between employer and employees by making it more likely that a new employer will be deemed a successor and by constraining the new employer’s ability to use the economic weapon of lockout. Because I do not believe that a new employer inheriting a unionized workforce under the Ordinance will be deemed a successor, I will not address that argument. Regarding the new employer’s ability to engage in a lockout, the Ordinance expressly states that both employers and employees retain their rights to lockout and strike, respectively.

. The NLRB General Counsel in M & M Parkside took the position that incumbent employees retained during a 90-day retention period have "probationary or contingent” status. 2007 WL 313429.

. See Burns, 406 U.S. at 280 n. 5, 92 S.Ct. 1571 ("The Board has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer.”); Howard Johnson, 417 U.S. at 262, 94 S.Ct. 2236 (“Clearly, Bums establishes that Howard Johnson had the right not to hire any of the [predecessor’s] employees, if it so desired.”); Fall River Dyeing, 482 U.S. at 40, 107 S.Ct. 2225 ("[T]he successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring.”)

. Indeed, it is the same argument made by the powerful dissenting opinions in Washington Service Contractors Coalition v. District of Columbia, 54 F.3d 811, 818-20 (D.C.Cir. 1995) (Sentelle, J., dissenting), and California Grocers, 127 Cal.Rptr.3d 726, 254 P.3d at 1040-53 (Grimes, J., dissenting).